IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LAWRENCE RIGBY, | Civil Action No. |
| Plaintiff, | |
| | JURY TRIAL DEMANDED |
| v. | |
| NEW GEORGIA PROJECT ACTION FUND, INC., | |
| Defendant. | |

## COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff Lawrence Rigby ("Plaintiff"), by and through his undersigned counsel, and files this, his Complaint for Damages against Defendant New Georgia Project Action Fund, Inc. ("NGPF") and shows the Court as follows:

## NATURE OF COMPLAINT

1.

Plaintiff brings this action for damages, and reasonable attorney fees against Defendant for violations of his rights under Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

## JURISDICTION AND VENUE

### 2.

Plaintiff invokes the jurisdiction of this court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

### 3.

The unlawful employment practices alleged in this Complaint were committed within this district. In accordance with 28 U.S.C. § 1391, venue is appropriate in this Court.

## ADMINISTRATIVE PROCEDURES

### 4.

Plaintiff has fulfilled all conditions necessary to proceed with this cause of action under the ADA. Plaintiff timely filed his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Upon Plaintiff's request, the EEOC issued Plaintiff's Notice of Right to sue on May 29, 2024.

### 5.

Plaintiff timely files this action within ninety (90) days of receipt of the Notice of Right to Sue from the EEOC.

## **PARTIES**

6.

Plaintiff is a male citizen of the United States of America and is subject to the jurisdiction of this Court.

7.

At all times relevant, Defendant was qualified and licensed to do business in Georgia, and at all times material hereto has conducted business within this District.

8.

At all times relevant, Defendant has  had fifteen or more employees. For each working day in each of twenty or more calendar weeks during 2022, 2023, and 2024, Defendant has had fifteen or more employees.

9.

Defendant was an employer subject to Title VII at all times relevant to the claims asserted herein.

10.

 Defendant may be served with process by delivering a copy of the summons and complaint to its Registered Agent, Tangelita Bush, at 501 Pulliam Street SW, Suite 406, Atlanta, GA, 30312, USA.

## **FACTS**

11.

Plaintiff began working for Defendant in or about November 2022.

12.

Plaintiff was hired by Defendant's Chief of Field and Organizing, Keron Blair.

13.

Blair nominally hired Plaintiff as a Lead Canvasser, but Plaintiff never performed any duties related to that role.

14.

Instead, Plaintiff was Blair's Executive Assistant.

15.

Plaintiff's email signature block identified him as an Executive Assistant.

16.

Plaintiff did not set his own work hours and his schedule and hours were controlled by Defendants.

17.

Lead Canvassers also do not set their own work hours.   .

18.

Blair routinely hires employees as Lead Canvassers when he knows they will not be performing that role.

19.

In explaining why, Blair said it was easier to "get people in the door that way."

20.

Blair had the ability to terminate Plaintiff's employment.

21.

Plaintiff performed work for both Defendantduring the period of November 2022 to January 2024.

22.

Blair is a homosexual male.

23.

Throughout Plaintiff's employment, he was sexually harassed by Blair.

24.

Blair engaged in sexual relationships with other employees of Defendants.

25.

Blair regularly asked Plaintiff to send him nude photographs of himself, throughout Plaintiff's employment with Defendants.

26.

Blair would regularly complain to Plaintiff that he had not sent him nude photos of himself as requested.

27.

Blair would regularly try to turn work related conversations with Plaintiff into sexual conversations.

28.

Blair would regularly ask Plaintiff to call him "daddy."

29.

Blair would also attempt to have Plaintiff meet him in person so that he could sexually harass Plaintiff physically.

30.

Blair would ask Plaintiff to masturbate for him while they were on video calls.

31.

On video calls, Blair would demand that Plaintiff stand up, pull down his pants, and show Blair his penis or his buttocks.

32.

One time in particular, in or about October 2023, Blair told Plaintiff after telling him to pull down his pants on a video call "I don't need the back, just pull down the front."

33.

Blair was ordering Plaintiff to show him his penis.

34.

Plaintiff had to avoid showing Blair his penis by telling him he was going to be mad and showing him the upper part of his pubic area and stomach were shaved.

35.

Plaintiff knew Blair was not attracted to clean shaven men because Blair had told him so.

36.

When Plaintiff showed Blair that his upper pubic area and stomach were shaven, Blair responded by saying "oh, you look completely shaven, bye."

37.

Blair then said "your other boyfriend, they like that? Does your other boyfriend like it shaven? Who's your other boyfriend? Am I your only boyfriend? I don't have people to compete with?"

38.

Plaintiff then pretended that he spilled juice on a rug so he could walk away and avoid continuing the conversation.

39.

On another call, Plaintiff asked Blair how he could assist him and Blair responded "show me some pussy," meaning Plaintiff's rear end.

40.

When Plaintiff asked again how he could be of assistance, Blair repeated "I just told you, show me some pussy."

41.

Plaintiff then said "not book your travel?"

42.

Blair then responded "not book my – stand up boy, let me see it," referring to Plaintiff's behind.

43.

Plaintiff then started to talk about Blair's travel itinerary again to avoid having to do so.

44.

Luckily, Blair then relented and started to speak about his travel plans with Plaintiff.

45.

Like in the calls described above, Plaintiff was frequently forced to avoid Blair's sexual advances by making up excuses as to why he could not comply with Blair's demands, or by ignoring them.

46.

This upset Blair.

47.

Blair would sometimes tell Plaintiff that he could "tell Plaintiff was not interested in him."

48.

Blair said this because he knew Plaintiff brushed off his sexual advances and was not interested in him sexually.

49.

However, even after making these comments, Blair would continue to sexually harass Plaintiff.

50.

In or about June 2023, another employee reported that Blair was sexually harassing male employees in Defendant's employ, including Plaintiff.

51.

That employee was terminated, in or about June 2023.

52.

Shortly thereafter, Blair told Plaintiff that he had "taken care of the problem" and to not mention the harassment he had perpetrated on Plaintiff to anyone.

53.

Then, also in or about June 2023, Blair told Plaintiff that Francys Johnson, Treasurer and Board Member for Defendants, had asked him if he had a sexual relationship with Plaintiff.

54.

Blair told Plaintiff he had told Johnson he did not have a sexual relationship with Plaintiff.

55.

Around or about the end of June 2023, as Plaintiff continued to not acquiesce to Blair's demands, Blair began to and continued to tell Plaintiff that he should do what he needed to do to keep Blair happy.

56.

Blair said this to let Plaintiff know that if he did not acquiesce to his sexual advances, there would be employment related consequences.

57.

After or around this time, Blair's harassment worsened.

58.

In November 2023, Blair's sexual harassment of Plaintiff escalated further.

59.

During that month, Blair had begun to plan for his birthday party the week of December 18, 2023.

60.

In November 2023, Blair specifically told Plaintiff that Defendant was going to be laying off employees and that he did not want anyone "who would not listen to his instructions" to remain employed.

61.

When Blair said so, he was referring to Plaintiff's refusal to acquiesce to his sexual demands.

62.

Even though Plaintiff was an employee, his "contract renewal period" was in December 2023 or January 2024 as Defendant misclassified Plaintiff as an independent contractor.

63.

Blair's treatment of Plaintiff continued to worsen into December 2023, when Blair finally demanded that Plaintiff come "visit him" in Atlanta for his birthday.

64.

Blair believed that Plaintiff lived in Washington D.C.

65.

In reality, like Blair, Plaintiff also lived in Atlanta, but kept that information from Blair so that he could avoid being pressured into meeting Blair in person.

66.

On or about December 18, 2023, Plaintiff texted Blair and told him that his "flight" to Atlanta had been delayed.

67.

Blair responded, in part by demanding to see proof that Plaintiff was at the airport and told Plaintiff that if he did not arrive, they were "absolutely done," meaning he would terminate Plaintiff, and told Plaintiff "do not fuck with me."

68.

That same day, Blair told Plaintiff that he was "so over whatever this is."

69.

When Plaintiff finally saw Blair in person, on or about December 19, 2023, Blair asked Plaintiff to have sex with him and another employee, Donte Donaldson, and told him Donaldson was "already there."

70.

Plaintiff refused to have sex with Blair or Donaldson, made up an excuse for having to leave, and left.

71.

Following the above-described events in Paragraphs 63 – 70, Blair sent an email to Human Resources asking Defendant to give a raise to Plaintiff.

72.

Blair then reported that Plaintiff had sent that email posing as him fraudulently.

73.

That was a lie.

74.

On or about January 8 or 9, 2024, Hopkins told Erin Ferguson, Defendant's Director of Administration, that he needed him to perform an investigation into this email.

75.

At the time, Ferguson administered all software and hardware for NGP.

76.

Ferguson told Hopkins that he would investigate but they needed to exercise caution and have all the facts before making such serious allegations.

77.

Within the next day, Ferguson investigated with the aid of a technology contractor, Multimedia Solutions, which shared administrative control over the relevant accounts that needed to be searched.

78.

Through his investigation, Ferguson discovered that the day email in question was sent, Plaintiff had not logged in to the Microsoft Network for the entire day.

79.

Ferguson's investigation also discovered that Blair had been logged in to the Microsoft Network for most of the day.

80.

On February 10 or 11, 2024, Ferguson reported his findings to Hopkins and told him that it did not make sense to believe Plaintiff had sent the email in question.

81.

Ferguson also told Hopkins that he could not even see a way that Rigby could have sent the email he was accused of sending.

82.

Hopkins then told Ferugson that Kendra Cotton, Defendant's CEO, believed Plaintiff had sent the email because the DocuSign document attached to it had two signatures from the same IP Address.

83.

Ferguson then investigated who was signed into the Microsoft Network the day the DocuSign document had been signed.

84.

Ferguson again discovered that that entire day, Plaintiff had not signed in, while Blair had been logged in throughout the day.

85.

Ferguson then reported back to Hopkins what he had discovered and submitted a report made by Multimedia Solutions to Hopkins and Cotton.

86.

This report included the sign-in and login details for the Microsoft Network on the relevant dates and a conclusion from Multimedia Solutions that it was unlikely that Rigby had sent the email being investigated.

87.

When submitting that report, Ferguson explained it to Cotton and again further explained that he did not see how Plaintiff could have sent the fraudulent email or how he could have been behind the DocuSign document.

88.

Erin Ferguson also explained to Kendra Cotton, Defendant's CEO, and Earvin Hopkins, Defendant's Chief People Officer, that it did not make sense to believe that Plaintiff had sent the email and that Plaintiff had not been logged in the entire day the email was sent or the entire day the DocuSign document attached to the email had been signed, and that Blair had been logged in both of those days.

89.

As a result of these accusations, Plaintiff contacted Ferguson to talk about the investigation that was being performed in the email.

90.

During that call, Plaintiff shared with Ferguson the sexual harassment he had been experiencing, and Ferguson told Plaintiff he should report the harassment to Defendant's Human Resources and Legal Departments.

91.

Plaintiff then reported Blair's sexual harassment via email to Tangelita Bush, Defendant's Legal Counsel, and Hopkins.

92.

That same day, Hopkins asked Plaintiff to come to Defendant's physical office location.

93.

Plaintiff then went to the office and again reported Blair's sexual harassment to Hopkins and Bush.

94.

During that report, Plaintiff played an audio recording of Blair ordering him to pull his pants down while they were on Facetime.

95.

Ferguson also reported to Cotton that Plaintiff had disclosed to him that Blair was sexually harassing him around this same time and that he had told Plaintiff to report the allegations to Human Resources and Defendant's legal department.

96.

Cotton demanded that Ferugson write a statement outlining exactly what Rigby had reported to him.

97.

During that conversation, Cotton said to Ferguson, "we went through this before" because NGP had dealt with sexual harassment allegations before involving the previous CEO, Nse Ufot, accusing Johnson of sexual harassment.

98.

Ferguson had also had another allegation of sexual harassment reported to him in December 2023 in which a direct subordinate of Blair had been accused of sexually harassing an employee. Ferguson encouraged the employee to report what was going on to Human Resources and gave a statement about what had been reported to him to Hopkins.

99.

Cotton then asked Ferguson whether Plaintiff had said he did not welcome Blair's advances and that Plaintiff would have to prove that he did not welcome Blair's sexual advances.

100.

Ferguson then responded by saying that Plaintiff had audio evidence of Blair's harassment, that he was not sure if those were the questions that Cotton should be asking, and that if he was her, he would be asking how to manage the investigations process to make sure that everyone was being treated humanely.

101.

Cotton then repeated that if Plaintiff could not prove he denied Blair's advances, it was not sexual harassment.

102.

Ferguson then gave Cotton a statement which stated in part the he had talked to Plaintiff about Plaintiff being sexually harassed by Blair, about the investigation into the email being retaliation, and that Plaintiff had said he was worried about going to Human Resources alone because sexual harassment on the part of Blair had been reported to Hopkins before and the other employee who reported it was terminated.

103.

Shortly after his meeting with Cotton about Plaintiff's allegations against Blair, Bush told Ferugson that "they," meaning Cotton and Blair, thought that Ferguson was the problem with the sexual harassment allegations and that they believed Ferguson was the one pushing sexual harassment allegations at NGP to the forefront.

104.

Respondent then hired a third-party investigator, to whom Plaintiff reported the same and sent them a copy of the audio recording.

105.

Ferguson reported the same things he had reported to Cotton, Hopkins, and Plaintiff to the investigator.

106.

The investigator then told Plaintiff not to contact Blair and that Blair had been told not to contact him.

107.

Because Plaintiff was Blair's Executive Assistant, this meant he had no work to do and was essentially on leave.

108.

However, a few days later, Blair attempted to contact Plaintiff via phone, which Plaintiff reported to Human Resources.

109.

Then, in early to mid-January 2024, Defendant terminated Plaintiff.

110.

Around this same time, Defendant also terminated Ferguson.

111.

Plaintiff only discovered that he was terminated when Defendant stopped paying him.

112.

Plaintiff then received an email from a Net Chex Online, Defendant's payment software company, which stated in part, "New Georgia Project Action Fund has had an employee terminated. Lawrence Rigby has been terminated…"

113.

Although Defendant purports to provide a legitimate non-discriminatory reason for the adverse action, this reason is pretext for unlawful retaliation in response to Plaintiff's protected activity. In addition, Plaintiff was terminated for his

refusal to engage in sexual relations with Blair, i.e., refusal of Blair's quid pro quo expectation of keeping Plaintiff employed only if he engaged in sexual relations.

## COUNT I: Retaliation in Violation of Title VII

114.

Plaintiff re-alleges paragraphs 11-113 as if set forth fully herein.

115.

Defendant's actions against Plaintiff (to wit, termination) because of his protected activity constitute unlawful intentional retaliation in violation of Title VII.

116.

Plaintiff engaged in protected activity under Title VII when he rejected Blair's sexual advances and when he complained about Blair's sexual harassment and retaliation against him for rejecting Blair's sexual advances.

117.

Defendant willfully and wantonly disregarded Plaintiff's rights, and Defendant's retaliation against Plaintiff was undertaken in bad faith.

118.

Accordingly, Defendant is liable for the damages Plaintiff has sustained as a result of Defendant's unlawful retaliation, including lost wages and emotional disress caused by the retaliation. Plaintiff is also entitled to punitive damages.

## COUNT II: SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Quid Pro Quo Claim)

119.

Plaintiff re-alleges paragraphs 11-113 as if set forth fully herein.

120.

Plaintiff is a member of a protected class, i.e. he is a man.

121.

Defendant took tangible employment action against Plaintiff because he rejected Blair's sexual demands. To wit, Defendant terminated Plaintiff employment because he rejected Blair's sexual demands.

122.

Defendant is liable for the sexual harassment of Plaintiff under a theory of vicarious or direct liability.

123.

Defendant has willfully and wantonly disregarded Plaintiff's rights, and Defendant's discrimination against Plaintiff was undertaken in bad faith.

124.

As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has been made the victim of acts that have adversely affected his psychological and physical well-being.

125.

Accordingly, Defendant is liable for the damages Plaintiff has sustained as a result of Defendant's unlawful discrimination. Plaintiff is entitled to recover compensatory damages, including damages for emotional distress.

126.

Defendant acted with malice and in reckless indifference to Plaintiff's federally protected rights. Plaintiff is entitled to punitive damages. Plaintiff is also entitled to lost wages and benefits, damages for emotional distress, attorneys' fees and costs, prejudgment interest, reinstatement or front pay in lieu thereof, and any other relief available under the law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(A)   Grant Plaintiff a trial by jury as to all triable issues of fact;

(B)   Grant Plaintiff damages for lost wages and benefits and prejudgment interest thereon;

(C)   Grant Plaintiff general damages for mental and emotional suffering caused by Defendant's unlawful conduct;

(D)   Grant declaratory judgment declaring that Plaintiffs' rights have been violated;

(E)   Grant Punitive damages based on Defendant's willful, malicious, intentional, and deliberate acts, including ratification, condonation and approval of said acts;

(F)   Grant Plaintiff reasonable attorneys' fees and expenses of litigation;

(G)   Grant injunctive relief of reinstatement, or front pay in lieu thereof, and prohibiting Defendant from further unlawful conduct of the type described herein; and

(H)   Award Plaintiff such further and additional relief as may be just and appropriate.

This 21st day of June, 2024.


**BARRETT & FARAHANY**

/s/ V. Severin Roberts
V. Severin Roberts
Georgia Bar No. 940504
Patrick Reid
Georgia Bar No. 888769

Douglas McMillan
Georgia Bar No. 621646
Attorneys for Plaintiff

P.O. Box 530092
Atlanta, GA 30353
(404) 214-0120
(404) 214-0125 facsimile
severin@justiceatwork.com
patrick@justiceatwork.com
dmcmillan@justiceatwork.com